

FILED
2022 Mar-14  PM 12:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **METAL ROOFING SOLUTIONS, INC.,** )<br>)<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,** )<br>)<br>)<br>)<br>**Defendant.** )<br>) | Civil Action Number<br>**2:20-cv-00935-AKK** |

## <u>MEMORANDUM OPINION AND ORDER</u>

To state the obvious, construction projects often involve an extensive paper trail of schematics, plans, and purchase orders. And they usually require contracts—sometimes tiers upon tiers of them. Such was the case in the current matter before the court. Metal Roofing Solutions, Inc., a sub-subcontractor, sues Travelers Casualty and Surety Company of America under Alabama's "little Miller Act," Alabama Code § 39-1-1, based on a construction project in which MJ Harris Construction Services, LLC served as the general contractor and Composite Manufacturing and Installers, Inc. served as a subcontractor. Doc. 1. Both MRS and Travelers have moved for summary judgment, docs. 28; 29, and submitted briefing and evidentiary material in support of their positions. As explained herein,

their motions are due to be denied because genuine disputes remain with respect to whether (1) the work orders MRS submitted to CMI after its final day on the project fall within the sub-subcontract amount that MRS can arguably recover and (2) MRS waived its claims in certain executed releases.

## I.

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56.  A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Because the court must construe the evidence in the light most favorable to the nonmoving party, summary judgment is only appropriate "if a case is so one-sided that [the movant] must prevail as a matter of law." *Id*. (citing *Anderson*, 477 U.S. at 251–52).  The filing of cross-motions for summary judgment does not alter this framework.  *See Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1314 (N.D. Ala. 2018) (citing *United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984)).

## II.

In 2017, MJ Harris entered into a construction contract with the University of Alabama at Birmingham for work on UAB's College of Arts and Sciences Building.

Doc. 31-1 at 2; *see* docs. 28 at 2; 30 at 2.  MJ Harris furnished and Travelers issued a $30,127,000 payment bond for the project.  Doc. 31-1 at 2–5.  The bond stated that "[a]ny person that . . . furnished labor, materials, or supplies for or in the prosecution of the Contract and Contract Change Orders for which payment ha[d] not been timely made" could "institute a civil action" upon the bond and "have their rights and claims adjudicated in a civil action and judgment entered thereon."  *Id.* at 3.

MJ Harris then subcontracted with CMI for certain manufacturing and installation services on the project.  *See* doc. 28 at 2–3.  MJ Harris primarily tasked CMI with fabricating and installing "aluminum composite material" or ACM panels for the building's exterior.  *See* docs. 28 at 2–3; 31-2; 32-3 at 6.  CMI subsequently entered into a sub-subcontract with MRS in which MRS agreed to install and caulk the ACM panels and CMI agreed to pay MRS $64,452.  Doc. 31-3 at 2, 5; *see* docs. 28 at 3; 30 at 2–3.

Several terms in MRS's and CMI's sub-subcontract are particularly relevant in this case.  For one, the sub-subcontract required "[a]ll work[-]order additions and[/]or omissions" to "be approved" by CMI, doc. 31-3 at 2, which, according to CMI President Erik Houston, required MRS to email the change order to CMI for Houston's signature and approval, doc. 31-5 at 4, 7–8.  Additionally, MRS agreed to (1) "accept all financial responsibility for any work [it] performed" that was "not covered" in the agreement or not approved by CMI; (2) "be responsible for

3

furnishing all tools and equipment required to fulfill [the] agreement"; (3) "be responsible for including any overtime, in its original bid, required to meet the completion schedule"; (4) "reimburse" CMI for "all cost[s]" CMI incurred due to MRS's "negligence"; and (5) "be financially responsible for the replacement of any damaged, lost, mis-measured, or stolen goods due to [MRS's] negligence." *Id.* at 2–3.  Invoices were "required by the 14th of each month and [would] be paid upon receipt of payment from [MJ Harris]." *Id.* at 2.  The sub-subcontract "[could] be modified or amended in writing . . . signed by the party obligated under the amendment" and would "be construed in accordance with the laws of the State of Tennessee." *Id.* at 4.  MRS President Bobbie Smith, Jr. signed this agreement in February 2019. *Id.*

Meanwhile, in late 2018, MRS began to work on the project, and it took field measurements of the building so CMI could manufacture ACM panels for MRS's installation. *See* docs. 28 at 3; 30 at 4–5; 31-5 at 6.  MRS and CMI dispute whether MRS took inaccurate measurements, *see* doc. 31-5 at 10, but agree that when the ACM panels arrived, they did not fit properly on the building, *see* docs. 28 at 4; 30 at 5.  As a result, MRS modified or remeasured the panels, requiring additional time and labor.[1]  Docs. 28 at 4; 30 at 5.  MRS claims that CMI told it to modify the panels

---

[1] MRS contends that it modified the panels on the ground, doc. 28 at 4, while Travelers claims that MRS remeasured some of the panels for CMI to refabricate, doc. 30 at 5.  Ultimately, the parties

in the field, doc. 28 at 4, and MRS did not send any work-order additions or changes to CMI for the remedial work during its time on the project, *see* docs. 30 at 5; 31-7 at 3; 31-8 at 3.  MRS finished its last day on the project on May 19, 2019.  *See* doc. 31-7 at 3.

During and after its work on the project, MRS executed several releases of certain claims against CMI and MJ Harris.  On April 29, 2019, MRS agreed to a "Progress Release of Lien and Affidavit" that included:

> **CURRENT   MONTH   CONDITIONAL   RELEASE:**   The undersigned lienor, in consideration of the sum of $25,000.00 due through the date of February 28, 2019, hereby waives and releases its lien and right to claim a lien for labor, services and/or materials invoiced to M.J Harris for the described property. The undersigned does hereby certify and warrant that all labor, services and/or materials described herein have been provided prior to the execution of this document and have been paid in full.

Doc. 31-19 at 2.  On June 14, 2019, MRS agreed to another "Current Month Conditional Release" and a "Release for Previous Payments Received to Date":

> **CURRENT   MONTH   CONDITIONAL   RELEASE:**   The undersigned lienor, in consideration of the sum of $16,275.70 due through the date of May 31[,] 2019, hereby waives and releases its lien and right to claim a lien for labor, services, and/or materials invoiced to CMI, Inc. for the described property. The undersigned does hereby certify and warrant that all labor, services and/or materials described herein have been provided prior to the execution of this document and have been paid in full.

\* \* \*

---

do not dispute that MRS performed some work to install accurately measured ACM panels after the original ones did not fit.

**RELEASE FOR PREVIOUS PAYMENTS RECEIVED TO DATE:** In consideration of ALL PAYMENTS RECEIVED THRU April 30, [20]19 amounting to $46,565.00 and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned as a subcontractor or supplier for the above project:

- (a.) covenants and warrants that all labor, materials, equipment, services and other items, including without limitation all payroll, sales and privilege taxes, furnished pursuant to the above contract and any additions or changes thereto, have been paid for with respect to all received payments;
- (b.) releases CMI, Inc. (Subcontractor), M.J. Harris Construction Services, LLC (Contractor) and the Owner of the project from all claims whatsoever arising out of or relating to this contract with respect to all received payments;
- (c.) waives any lien rights with respect to the project for all received payments; and
- (d.) agrees to indemnify the first-tier Subcontractor, M.J. Harris Construction Services, LLC and the Owner against any claim or lien asserted through or under the undersigned with respect to this project for all received payments.

Doc. 31-20 at 2. The meaning and import of these releases are at issue in this case.

On July 22, 2019, MRS sent a notice of nonpayment to MJ Harris and CMI for "the sum of $17,877.00 which has not been paid, which constitutes amounts owed through the 31st day of May, 2019, and includes retention in the amount of $1,611.30." Doc. 31-9 at 2 (emphases omitted). Several days later, CMI's director of sales, Hank Phillips, emailed MRS with caulking-related issues for MRS's review and a "punch list"[2] for it to complete so CMI could "release final payments." Doc.

---

[2] In the construction industry, the term "punch list" refers to a list of items that require completion or correction to conform to the contract. *See, e.g.*, *Strickland v. Arch Ins. Co.*, 718 F. App'x 927, 928 (11th Cir. 2018); *Bella Invs., Inc. v. Multi Family Servs., Inc.*, 97 So. 3d 787, 790 (Ala. Civ. App. 2012).

6

31-8 at 5.    Smith replied that MRS "need[ed] past due payments before [it] [did] anything" and that the parties "ha[d] . . . to determine extra cost for rehabbing panels on site as well."  *Id.*  Houston responded that CMI "[could] send a check" the following week but "need[ed] to know when [MRS] would be onsite to fix the issues," presumably, those on the punch list.  *See id.* at 4.

Over the next two weeks, MRS's office manager, Catherine Newell, emailed Houston to inquire as to MRS's final check.  *See* doc. 31-8 at 3–4.  Houston replied that CMI would send the check but was "gathering up the receipts for what it cost [CMI] to do the punch[]list that MRS refused to do."  *Id.* at 3.  Smith responded that MRS refused to do the punch list because CMI "never provided payment as [it] promised numerous times" and that MRS "[would] be sending tickets for the additional cost to refab all of the panels on site."  *Id.*

On August 22, 2019, Smith emailed five work orders for "refabricating the panels" and "material supplied."  *See* docs. 30 at 5; 31-8 at 3.  Work Order 1, dated May 21, 2019, claimed costs of $2,500 for "lifting" and furnishing "back up support plates," doc. 28-1 at 27; Work Order 2, undated, claimed costs of $7,956.85 for elevating a canopy and revising certain panels, *id.* at 28; Work Order 3, undated, claimed costs of $50,438.34 for cutting and rerouting panels, *id.* at 29; Work Order 4, undated, claimed costs of $52,556.64 for correcting certain panels, *id.* at 30; and Work Order 5, undated, claimed costs of $5,699.40 for modifying certain panels, *id.*

7

at 31.  According to Smith, MRS completed the work in Work Orders 1 and 3 in late January or February 2019, the work in Work Order 2 in May 2019, and the work in Work Orders 4 and 5 in April 2019.[3]  *See* doc. 31-6 at 9–10, 17–18.

In total, MRS submitted $119,151.23 worth of additional work orders.  *See id.* at 38; doc. 28 at 5.  Smith testified that he did not submit them until after MRS finished its work on the project because he was "very, very busy" and "it's not uncommon to clean up this stuff at the end of a project," especially given that CMI "[was] aware of it."  Doc. 31-6 at 9.  For his part, Houston never signed or returned the work orders and instead "ignored them."  Doc. 32-3 at 18.

In November 2019, MRS wrote Travelers that MRS "ha[d] not been paid on the balance of its original contract or for the five additional work orders . . . rendered in connection with the Project" for a total of "$137,038.23 for labor and/or materials."  Doc. 31-22 at 2–3.  Travelers rejected MRS's claim due to "lack of substantiation."  Doc. 31-23 at 2.  MRS subsequently submitted another claim to Travelers with a "net current amount due" of $132,448.15.  Doc. 31-7 at 3.  Travelers rejected this claim, too, asserting that "[t]he $119,151.23 in change orders claimed by MRS [were] unapproved, unsubstantiated, and may have been waived by MRS" and "[t]he undisputed Subcontract balance [was] $17,887.00, which [was] being

---

[3] Smith testified that MRS performed the work in Work Order 4 in April of "either 2019 or 2020." Doc. 31-6 at 17.  But because MRS's last day on the project was May 19, 2019, the court assumes this work occurred in 2019.

paid by [MJ Harris] to MRS."  Doc. 31-24 at 2–3.  MJ Harris sent MRS a check for $17,887 on the same day.  Doc. 31-25 at 2.

MRS filed this lawsuit against CMI and Travelers to collect payment on the work orders.  *See generally* doc. 1.  *See also* doc. 28 at 6.  Against CMI, MRS asserted claims for breach of contract, collection for materials supplied and services performed, and unjust enrichment.  Doc. 1 at 5–7.  Against Travelers, MRS asserted a payment bond claim under Alabama's "little Miller Act."  *Id.* at 5.  CMI counterclaimed against MRS for breach of contract, negligence, indemnity, and breach of warranty.  Doc. 13.  On joint motion by MRS and CMI, the court issued a consent judgment in favor of MRS and dismissed CMI's counterclaims.  *See* docs. 24; 25.  The consent judgment acknowledged that "[t]he Outstanding Indebtedness ha[d] not been satisfied and [that] nothing contained in [it] discharge[d] Travelers as surety."  *Id.* at 2.  MRS seeks to use this judgment against Travelers, essentially contending that it evidences CMI's approval of the additional work—and the work orders—that MRS performed and submitted.  *See* doc. 28 at 13–14.

## III.

The court turns first to the general framework governing little Miller Act claims before addressing the parties' specific contentions.

A.

"Alabama's Public Work statute, § 39-1-1, requires public contractors to execute a bond which secures payment to individuals who furnish labor and materials in the performance of government contracts." *Trane Co. v. Whitehurst-Lassen Constr. Co.*, 881 F.2d 996, 1001 (11th Cir. 1989).  This bond serves to prevent the nonpayment of suppliers and laborers who work on public projects by shifting the risk of nonpayment to a surety.  *See Johnson Controls, Inc. v. Liberty Mut. Ins. Co.*, 160 So. 3d 249, 259 (Ala. 2014); *Fed. Ins. Co. v. I. Kruger, Inc.*, 829 So. 2d 732, 736 (Ala. 2002).  Patterned after the federal Miller Act, Alabama's little Miller Act provides that

> any person that has furnished labor, materials, or supplies for or in the prosecution of a public work and payment has not been made may institute a civil action upon the payment bond and have their rights and claims adjudicated in a civil action and judgment entered thereon.

ALA. CODE § 39-1-1(b).  The Act does not require privity of contract for the supplier or laborer to collect payment; rather it "focuses exclusively on the intent for which the labor, materials, or supplies [were] furnished. . . ." *Johnson Controls, Inc.*, 160 So. 3d at 260.[4]  Indeed, the statute "is highly remedial in nature and is liberally construed to effectuate its purpose of ensuring that suppliers receive full

---

[4] This is so even where the terms of the payment bond "limit claimants to those having a direct contract with either the contractor or a subcontractor" because "when a payment bond is issued to satisfy the provisions of § 39-1-1, . . . the requirements of the statute will be read into the bond." *See Johnson Controls, Inc.*, 160 So. 3d at 260 (citing *Kruger*, 829 So. 2d at 736).

compensation for the [labor] or materials they provide to public works projects." *Trane*, 881 F.2d at 1001.

As a result, "absent a novation, waiver, estoppel, or other clear and explicit relinquishment of the statutory right, a supplier is entitled to pursue payment under a bond." *Id.* at 1002; *Safeco Ins. Co. of Am. v. Graybar Elec. Co.*, 59 So. 3d 649, 656 (Ala. 2010). To successfully pursue payment, a plaintiff must show that (1) it supplied materials or labor for work on the public project; (2) it was not paid for the materials or labor; (3) it had a good-faith belief that the materials or labor were for the public project; and (4) the jurisdictional requisites have been met.[5] *See Kruger*, 829 So. 2d at 736 (citing *A.G. Gaston Constr. Co. v. Hicks*, 674 So. 2d 545, 547 (Ala. Civ. App. 1995); *United States ex rel. Krupp Steel Prods., Inc. v. Aetna Ins. Co.*, 831 F.2d 978, 980 (11th Cir. 1987)).[6] And the court notes two overarching principles: "The contractor must be liable for some claim . . . before the surety can be liable," and the amount properly recoverable by a subcontractor is the agreed-upon contract sum. *Hicks*, 674 So. 2d at 547 (quoting favorably the trial court's

---

[5] "Section 39-1-1(b) provides that 'a civil action shall not be instituted on the bond until 45 days after written notice to the surety of the amount claimed to be due and the nature of the claim.' Furthermore, § 39-1-1(b) provides that '[t]he civil action shall be commenced not later than one year from the date of final settlement of the contract.'" *Johnson Controls, Inc.*, 160 So. 3d at 262.

[6] Alabama courts "traditionally have looked to federal decisions interpreting the [federal] Miller Act to provide guidance in interpreting Alabama's statute." *Hicks*, 674 So. 2d at 547 (internal quotation marks omitted).

order); *Magic City Paint & Varnish Co. v. Am. Sur. Co.*, 152 So. 42, 43 (Ala. 1934);

*Price v. H.L. Cable Constr. Co.*, 317 F.2d 312, 317 (5th Cir. 1963).[7]

## B.

In this case, MRS received the agreed-upon amount of its sub-subcontract

with CMI, or $64,452, and seeks the costs of the work orders it submitted after the

project's completion.  The labor and materials MRS supplied to refabricate or correct

the ACM panels were clearly for its work on the project, which included installing

and caulking the ACM panels, and CMI did not pay MRS the $119,151.23 MRS

claims for that work.  *See* doc. 28 at 12; *Kruger*, 829 So. 2d at 736.  Thus, MRS has

facially established the first two elements of its little Miller Act claim.

Additionally, MRS has established that it held a good-faith belief that its

materials and labor were for the project in question.  Its work orders indicate and

describe the labor and materials it required to refit the panels, *see* doc. 28-1 at 27–

---

[7] The Fifth Circuit explained:

> Assume what must be a typical case: A, prime contractor, with a contract to build
> three buildings in a government project, sublets the construction of one of them to
> a subcontractor. B, the subcontractor, in turn sublets the plumbing work to a
> plumbing contractor. The contract is let to the plumbing subcontractor at a stated
> or fixed price. For this the plumbing contractor furnishes labor and materials
> including the stipulated plumbing fixtures. If the plumbing contractor has to sue the
> surety company, the amount of his recovery is measured by the contract sum, and
> of course the contract sum includes the contractor's profit. If such a contractor
> cannot include a profit, he would not be in business. The language of the Alabama
> statute is consistent with the view that in such case the recovery would be based on
> the contract sum.

*Price*, 317 F.2d at 317.

31, and Smith testified at length about when and why MRS purportedly had to perform this work to ensure it installed the panels properly, *see* doc. 31-6 at 9–10, 17–18. *See Johnson Controls, Inc.*, 160 So. 3d at 262 (finding this element satisfied where purchase orders, conversations, and the subcontractor's performance demonstrated that equipment and materials "were ordered for use in the renovation project"). Finally, the parties do not appear to dispute that MRS has met the jurisdictional prerequisites. Thus, MRS has established its *prima facie* case.

However, two questions remain. First, because MRS received the agreed-upon sum of $64,452, the court must inquire whether the $119,151.23 it seeks is also recoverable as part of the sub-subcontract sum—*i.e.*, whether the work orders fall within the agreement such that MRS has not been "fully paid." *See Hicks*, 674 So. 2d at 547; *Magic City Paint & Varnish Co.*, 152 So. at 43; *Price*, 317 F.2d at 317. Second, the court must determine if the releases MRS signed waived its claim. *Safeco*, 59 So. 3d at 656; *Trane*, 881 F.2d at 1002.

## C.

MRS already recovered the explicit sub-subcontract amount but contends that the cost of the five work orders also falls within that amount and is recoverable under the little Miller Act. *See* doc. 28 at 12. Travelers responds with the following. First, it contends that the labor and materials contained in the work orders fell within the scope of the work the sub-subcontract already required MRS to perform in exchange

13

for $64,452.  *See* doc. 30 at 16.  On that note, Travelers argues that CMI never approved the additional work, which resulted from MRS's negligent mismeasuring, and so MRS assumed responsibility for it under the sub-subcontract.  *Id.*  Travelers also claims that even if MRS could recover for the work orders, MRS waived its claim under the releases.  *Id.* at 16–17.  Last, Travelers contends that MRS fails to provide sufficient evidence of the allegedly owed amounts, which would "be subject to recoupment for MRS's failure to complete work it was contractually obligated to do," like the punch list.  *See id.* at 17.  The court turns first to the sub-subcontract's scope and price before addressing the possible waiver and recoupment.

1.

"The amount properly recoverable by a subcontractor is the agreed contract amount."  *Hicks*, 674 So. 2d at 547 (citing *Price*, 317 F.2d at 317).  In this case, the sub-subcontract provided that if MRS realized it had to perform other work on the project and thus receive additional compensation, it needed to submit "work order additions and[/]or omissions" to CMI for approval, apparently by emailing Houston the proposed orders for his review.[8]  Doc. 31-3 at 2.  Otherwise, the sub-subcontract required MRS to "accept financial responsibility" for work it performed that was not "covered" or approved by CMI.  *Id.* at 2.  The parties do not dispute that (1) Smith

---

[8] Relatedly, if MRS or CMI wished to amend their sub-subcontract, they had to submit the change in writing for signature by the party obligated under the amendment.  Doc. 31-3 at 2.

did not send the additional work orders for refabricating the ACM panels until at least two months after MRS's final day on the project, and (2) Houston did not sign off on the work orders when Smith sent them.  On this basis, Travelers argues that CMI never approved the additional work that MRS undertook as required, and so the additional work orders do not fall within the agreed-upon sum.

MRS seeks to avoid its failure to comply with the contractual terms by noting that MRS and CMI later consented to a judgment against CMI on MRS's claims for breach of contract, collection, and unjust enrichment "in the amount of $195,880.31, which is comprised of the principal amount of $119,151.23" plus interest and attorneys' fees.  *See* doc. 25 at 2–3.  MRS argues that this consent judgment evidences CMI's approval of the work orders and demonstrates that the $119,151.23 falls within the sub-subcontract amount.  This contention overlooks that Travelers did not consent to this judgment, and a consent decree is binding only on the parties to it.  *See Lott v. Toomey,* 477 So. 2d 316, 319 (Ala. 1985).  As the Supreme Court aptly put it, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party . . . without that party's agreement. . . . [and] a court may not enter a consent decree that imposes obligations on a party that did not

consent to the decree." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986).[9]

Still, because the court must construe the evidence in the light most favorable to MRS on Travelers's motion, the court accepts that the consent judgment appears to reflect CMI's agreement that MRS is owed at least $119,151.23 under the sub-subcontract due to the work orders. And rather than impose a new obligation on Travelers, this consent judgment may reflect CMI's ultimate ratification of the work orders and bring them within the purview of the sub-subcontract amount. Indeed, the sub-subcontract seems to be silent on the timing of work-order approvals, and the meaning of the sub-subcontract with respect to the manner and timing of work-order approvals has not been squarely presented to or briefed before this court. Accordingly, genuine disputes remain as to whether, through the consent judgment and under the sub-subcontract, CMI can approve and has approved MRS's five additional work orders. These factual issues bear on whether MRS has been "fully paid" under the sub-subcontract and therefore preclude summary judgment.[10]

---

[9] *See also Riddle v. Cerro Wire & Cable Grp., Inc.*, 902 F.2d 918, 921 (11th Cir. 1990) ("Even if a consent decree purports to affect the rights of third parties, those parties are not bound by the terms of the decree unless their interests were adequately represented by a party to the decree.").

[10] MRS also contends that someone from CMI "directed [MRS] to fix the panels" during the project, docs. 28 at 4; 28-1 at 14, although Houston essentially testified that change orders had to go through him via email, doc. 31-5 at 7–8. Although MRS primarily argues that the consent judgment evidences CMI's approval of the work orders, to the extent that it also argues CMI approved the work orders during the project, this allegation remains in dispute.

2.

Moreover, under the sub-subcontract, MRS agreed to reimburse CMI for all costs CMI incurred due to MRS's "negligence," doc. 31-3 at 2, and to "be financially responsible for the replacement of any damaged, lost, mis-measured, or stolen goods due to [MRS's] negligence," *id.* at 3. The parties dispute whether the additional labor and materials required to refabricate the ACM panels resulted from MRS's negligent mismeasuring or CMI's manufacturing errors and the extent of the work MRS had to perform to address the errors.[11] Accordingly, genuine disputes remain as to whether MRS can recover the costs of its labor and materials, which would likely not fall under the sub-subcontract if they in fact resulted from MRS's negligence or mismeasuring. Summary judgment is improper on this ground as well.

3.

Also, the meanings of the releases that may have waived MRS's little Miller Act claim are disputed. Whether a release's meaning is clear is a question of law that a court may answer at summary judgment. *See Wayne J. Griffin Elec., Inc. v. Dunn Constr. Co.*, 622 So. 2d 314, 316–17 (Ala. 1993).[12] That the parties assert

---

[11] *Compare* doc. 28 at 4 ("Unfortunately, when the ACM panels arrived onsite at the UAB Project, certain panels were not made with the dimensions needed. . . . As a result, the panels had to be modified in the field which took significant time.") *with* doc. 30 at 5 ("A number of the measurements provided by MRS were incorrect, requiring MRS to take new measurements and requiring CMI to refabricate certain panels.").

[12] The court notes that although the underlying sub-subcontract references Tennessee law, *see* doc. 31-3 at 4, the releases do not. Also, the parties argue their positions as to the releases under the

different constructions of a release does not force a finding of ambiguity. *Id.* at 317. Rather, a release is unambiguous if the court can construe only one reasonable meaning, and an unambiguous release "will be given effect according to the intention of the parties from what appears in the four corners of the document itself." *Id.* The court must give effect to "the plain and clear meaning of the terms of the document" and presume that the parties "intended what is plainly and clearly set out in that document." *Id.*

Here, the parties sharply contest whether the language in the April 2019 and June 2019 releases waived MRS's little Miller Act claim in exchange for payments with respect to the work MRS performed and ostensibly billed through those dates— or whether the releases waived claims only as to the work for which MRS invoiced through those dates. *See* docs. 30 at 23–26; 34 at 6–12; 35 at 11–12; 36 at 4–5. Their dispute seems to turn on the meanings of certain phrases in each release that may limit the scope of MRS's waiver, and these phrases are not susceptible to just one reasonable interpretation.

In the April 2019 release, MRS agreed to "waive[] and release[] its lien and right to claim a lien *for labor, services and/or materials invoiced to M.J Harris for the described property*" in exchange for "$25,000.00 due through the date of

---

laws of Alabama, *see* docs. 30 at 22–23; 35 at 10; 36 at 4, where the releases were signed, *see* docs. 31-19 at 2; 31-20 at 2. Thus, the court cites to Alabama law on this issue.

February 28, 2019." Doc. 31-19 at 2 (emphasis added). Similarly, in June 2019, MRS agreed to "waive[] and release[] its lien and right to claim a lien *for labor, services, and/or materials invoiced to* <u>*CMI, Inc.*</u> *for the described property*" in exchange for "$<u>16,275.70</u> due through the date of <u>May 31</u>[,] 20<u>19</u>." Doc. 31-20 at 2 (emphasis added). In the same document, MRS "release[d]" CMI and MJ Harris "from all claims whatsoever arising out of or relating to this contract *with respect to all received payments*" in consideration of "ALL PAYMENTS RECEIVED THRU <u>April 30</u>, [20]<u>19</u> amounting to $<u>46,565.00</u> and other good and valuable consideration." *Id.* (emphasis added).

It is possible that the emphasized portions of these releases limit their scope precisely as MRS argues. The "Current Month Conditional Releases" use the phrase "invoiced to," *see* docs. 31-19 at 2; 31-20 at 2, suggesting that the releases waived claims related only to the labor and materials for which MRS billed MJ Harris and CMI as of those dates.[13] *See* doc. 34 at 11. MRS did not send any work orders or bills for the refabrication of the ACM panels until August 2019. Thus, the costs contained in the work orders were not "invoiced to" MJ Harris or CMI when MRS executed those releases, and perhaps MRS did not waive claims as to those costs.

---

[13] Used as a verb, the word "invoice" means "to write or send somebody a bill for work you have done or goods you have provided." *Invoice*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/invoice_2 (last visited Mar. 10, 2022).

At the same time, however, the conditional releases make no mention of invoices for additional work allegedly outside the sub-subcontract's original scope, and MRS finished its last day on the project in May 2019. Thus, MRS had already furnished all of the relevant labor and materials by the time it signed the June 2019 release, making it unclear whether the panel-related *labor* was invoiced generally but the *additional costs* were not.

In addition, in the second part of the June 2019 waiver, MRS "covenant[ed] and warrant[ed] that all labor, materials, equipment, services and other items . . . furnished pursuant to the above contract and any additions or changes thereto, ha[d] been paid for with respect to all received payments" and released CMI and MJ Harris from "all claims whatsoever arising out of or relating to this contract with respect to all received payments." Doc. 31-20 at 2. The court cannot discern one reasonable meaning of the phrase "with respect to all received payments" as used in the release from the document alone. It could mean MRS released any claims that stemmed from the $46,565 it had received through the end of April 2019, leaving it free to assert claims only as to the sub-subcontract balance, or $17,887. Or it could mean MRS was free to assert claims regarding any work it performed through its final day for which it had not yet invoiced CMI, outside of the $46,565 it had received. And still, MRS warranted that it had received payment "with respect to all received payments" for all labor, services, and other items it provided

20

"pursuant to the . . . contract *and any additions or changes thereto*." *Id.* (emphasis added). Because the court cannot discern only one reasonable meaning from the four corners of these documents, genuine disputes persist regarding MRS's alleged waiver of its little Miller Act claim.

4.

Finally, Travelers claims that even if MRS can theoretically recover these additional amounts, it has not proven the amounts it claims—amounts that "would be subject to recoupment for MRS's failure to complete work it was contractually obligated to do," like the punch list. *See* docs. 30 at 17; 31-8 at 3–4. For its part, MRS submitted evidence of its purported work and costs to refabricate the ACM panels through the work orders themselves and the testimony of its president. *See, e.g.*, doc. 28-1 at 6–16 (portions of the relevant testimony); *id.* at 27–31 (the work orders). Moreover, MRS argues that the consent judgment it entered with CMI proves that MRS is owed $119,151.23 as principal. Doc. 28 at 14. MRS also asserts that it failed to complete the punch list because CMI withheld payment, which CMI claimed it did due to MRS's failure to finish the punch list. *See* doc. 31-8 at 3–4. These factual issues are necessarily entangled with the import of the consent judgment and the scope of the sub-subcontract, and Travelers's recoupment argument rests in part on the contested claims about the punch list. Thus, genuine

21

disputes remain as to whether, if MRS can recover for the work orders, it can recover $119,151.23, with interest and attorney's fees.

## IV.

In sum, factual issues remain regarding whether the additional work and work orders MRS performed and belatedly submitted for $119,151.23 fall within the agreed-upon amount and whether MRS waived its little Miller Act claim under the ambiguous releases it signed.  MRS's and Travelers's cross-motions for summary judgment, docs. 28; 29, are therefore **DENIED**.  MRS's claim will proceed to a pretrial conference on April 21, 2022, and a bench trial on May 31, 2022.[14]

**DONE** the 14th day of March, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[14] The court previously set the bench trial for May 30, 2022.  *See* doc. 23.  Because May 30 is a federal holiday, proceedings will begin on May 31.  The court will reset this date by separate order.